697 So.2d 805 (1996)
Robert A. CONSALVO, Appellant,
v.
STATE of Florida, Appellee.
No. 82780.
Supreme Court of Florida.
October 3, 1996.
Rehearing Denied July 17, 1997.
As Revised on Denial of Rehearing October 16, 1997.
*809 Richard L. Jorandby, Public Defender and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General and Sara D. Baggett, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
Robert Consalvo appeals his convictions for armed burglary and first-degree murder and sentence of death. We have jurisdiction under article V, section 3(b)(1), Florida Constitution, and we affirm the convictions and sentence.

FACTS
On September 21, 1991, at 8 p.m. the victim, Ms. Lorraine Pezza, who was accompanied by her neighbor Robert Consalvo, drove to an automatic teller machine and withdrew $200 from her bank account. She placed $140 of that money in the glove compartment of her vehicle and placed the remaining $60 in her purse. At approximately 1:30 a.m. Pezza and Consalvo returned to the former's apartment and, at around 2:30 a.m., Pezza realized that she had left the money in her car and looked for her car keys which she never found. She used a spare key to unlock her car and discovered the $140 missing from the glove box. At this point she called the police.
At around 3 a.m. Officer William Hopper was dispatched to Pezza's apartment. Pezza, with Consalvo present, reported to Hopper that she had lost or somebody had stolen $140 and a set of keys. Hopper asked Consalvo about the missing money and keys and he denied any wrongdoing. As Hopper was writing his report in his patrol car, he was again dispatched to Pezza's apartment. With Consalvo no longer present, Pezza told the officer that she suspected Consalvo of taking her keys and money.
Two days later, on September 24, 1991, Detective Douglas Doethlaff received a phone call from Pezza inquiring how to file charges against Consalvo. Doethlaff advised Pezza that more identifying data was needed on Consalvo and indicated he would contact Consalvo. Doethlaff then contacted Consalvo and told him that Pezza wished to proceed with the case and that it was his word against hers. Consalvo continued to deny any wrongdoing.
On September 27, 1991, from 10 a.m. to 11 a.m., Pezza employed a locksmith to change the locks on her apartment door and her mailbox. The locksmith subsequently stated that he was also asked to change the locks on the victim's car, but was unable to do so. The locksmith was the last witness to see Pezza alive. At 4:08 p.m. on the same day, Consalvo was documented on videotape using Pezza's ATM card. Consalvo also used Pezza's ATM card on September 29 and 30, 1991. The manager of a motel testified that on September 30, 1991, he saw appellant driving a car "similar" to Pezza's.
On October 3, 1991, at approximately 12:40 a.m., Nancy Murray observed a man wearing a brown towel over his head cut a screen door and enter the residence of Myrna Walker, who lived downstairs from the victim. Murray called the police and Consalvo was apprehended while burglarizing the apartment. *810 Fresh pry marks were found on a sliding glass door along with a cut porch screen. Assorted jewelry was found lying on the bedroom floor with a screwdriver and towel. When police searched Consalvo, they found checkbooks belonging to Pezza, as well as to Walker, and a small pocketknife. Consalvo was arrested and subsequent to his arrest, Consalvo repeatedly asked the police what his bond would be for this burglary offense and how quickly he could be released.
That same day, Detective Doethlaff went to Pezza's apartment to investigate why Consalvo was in possession of her checkbook. Doethlaff observed fresh pry marks on Pezza's front door between the deadbolt and the doorknob. When no one answered the door, which was locked, Doethlaff left a business card at the door requesting Pezza to contact the police. That evening, after Pezza's family had tried unsuccessfully for several days to reach her, Eva Bell, a social worker for the Broward Mental Health Division, went to the victim's apartment to check on her.[1] While at the apartment, Bell encountered Pezza's next-door neighbor, Consalvo's mother, Jeanne Corropolli. Corropolli, who lived with Consalvo, related to Ms. Bell that her son had been arrested earlier that day (for the burglary of Mrs. Walker's apartment). After receiving no response at Pezza's apartment, Bell contacted the police. At 7:16 p.m. Officer Westberry responded to Bell's request to check on Pezza. He knocked on Pezza's apartment door without getting a response and noticed Doethlaff's business card was still in the door jamb. The officer went back to his patrol car to complete his report. Bell, who was still in Corropolli's apartment, testified that shortly after the officer left the apartment, Corropolli was on the phone. Corropolli hung up the phone and became hysterical. Corropolli told Bell that her son, Robert Consalvo, said that he was "involved in a murder."[2] Corropolli testified that when she told her son the police were next door, he replied, "Oh, shit." Bell immediately related this information to Officer Westberry, who then forced open Pezza's apartment door and discovered her decomposing body in the apartment. The porch screens of Pezza's apartment were cut.
At 10:10 p.m., Detective Gill of the Broward Sheriff's Office contacted Consalvo at the Pompano Jail Annex. After advising Consalvo of his rights, Gill notified Consalvo that they wanted to speak to him about Pezza's checks being found on his person at the time of his arrest. Consalvo responded by stating: "[Y]ou are not going to pin the stabbing on me." At this time, Gill did not know that Pezza had been stabbed.
At 2:30 a.m. the next day, Detective Gill effectively arrested Consalvo by filing an add charge against him for the murder of Lorraine Pezza. Consalvo had not yet been released on bond for the burglary charge. When a search warrant was executed on Corropolli's apartment, the police found a bloody towel in a dresser in Consalvo's bedroom. Subsequent DNA testing matched the blood on the towel with the victim's blood. In a statement to the police, Consalvo's mother confirmed that her son had in fact called her from the county jail and had advised her that he might be implicated in a homicide. She further informed police that she had found a towel in her son's room with blood on it.
While incarcerated in the Broward County Jail, Consalvo made inculpatory statements to a fellow inmate named William Palmer. Consalvo told Palmer that he killed Pezza after she caught him burglarizing her apartment and said she would call the police. When she started to yell for help, Consalvo stabbed her. Lorraine Pezza was stabbed three times with five additional superficial puncture wounds. The fatal wound was to the left side of the chest. According to the testimony of Dr. Ronald Wright, the medical examiner, this could have occurred only if the victim was lying down at the time. The additional stab wounds were to the right upper chest and the right side of the back. *811 The five superficial puncture wounds were to the back. Dr. Wright classified the manner of death as homicide and estimated that death occurred approximately three to seven days before the body was discovered.
On February 11, 1993, appellant was convicted of armed burglary and the first-degree murder of Lorraine Pezza. The jury recommended the death sentence by a vote of eleven to one. The trial court found two aggravating factors: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary, see § 921.141(5)(d), Fla.Stat. (1995); and (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, see id. § 921.141(5)(e). The court found no statutory mitigating circumstances. As for nonstatutory mitigating circumstances it accorded the following "very little weight": (1) appellant's employment history; and (2) appellant's abusive childhood. Because the "mitigating factors have been given very little weight and they in no way offset the aggravating factors," the trial court found the death sentence "fully supported by the record."

APPEAL
Consalvo raises twenty claims in this appeal.[3] Claims (3), (5), (6), (7), and (10) were not properly preserved for appellate review and are therefore procedurally barred. Further, assuming arguendo that claims (3), (5), (7) and (10) were preserved for appeal, we have considered them and find them to be without merit. The legal claims raised in issues (11),[4] (13),[5] (17),[6] (18),[7] and *812 (19)[8] have been previously rejected by this Court and do not require additional discussion.

Discovery
Appellant argues that the State committed several discovery violations. First, he asserts the State committed a discovery violation by failing to disclose that a laboratory tried to test cigarette butts found in the victim's toilet but was unable to test them.
Rule 3.220(b)(1)(J), Florida Rules of Criminal Procedure, requires the prosecutor to disclose to defense counsel "reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons." In this case, the cigarette butts were sent to a crime lab but the lab could not perform any tests on the butts, and no reports or statements were generated as a result. We find no error in the trial court's determination that no discovery violation occurred under these circumstances and that a Richardson[9] hearing was not required. Matheson v. State, 500 So.2d 1341, 1342 (Fla.1987).
We also find the State's failure to disclose the letter requesting the lab analysis of the cigarette butts did not constitute a discovery violation. Rule 3.220(b)(1)(K), Florida Rules of Criminal Procedure, requires the prosecutor to disclose to defense counsel "any tangible papers or objects that the prosecuting attorney intends to use in the hearing or trial and that were not obtained from or that did not belong to the accused." Documents simply used to procure or elicit evidence are not subject to disclosure. State v. Gillespie, 227 So.2d 550, 556-57 (Fla. 2d DCA 1969); Fla.R.Crim.P. 3.220(g)(1). Furthermore, the State did not use the letter during its examination of Detective Gill.
Appellant further maintains the State committed a discovery violation when, after the defense's opening statement which asserted a possible third party killer theory, the State informed the defense that the fingerprint expert had identified several previously unidentified prints as belonging to the victim's deceased boyfriend.
Rule 3.220(j), Florida Rules of Criminal Procedure, provides for a party's continuing duty of disclosure:
If, subsequent to compliance with the rules, a party discovers additional witnesses or material that the party would have been under a duty to disclose or produce at the time of the previous compliance, the party shall promptly disclose or produce the witnesses or material in the same manner as required under these rules for initial discovery.
Months before trial the State disclosed the fingerprint expert's name (Tom Messick) and his thirteen-page latent fingerprint report to the appellant. There were some forty unidentified latent fingerprints in the victim's apartment. The prosecutor asked Messick the day before trial to determine if any of those prints could match the victim. However, in addition to acting on the State's request, *813 Messick ran the unidentified prints through a computer database to check for other possible matches. The computer identified the victim's deceased boyfriend, Scott Merriman, as a potential match. Messick retrieved Merriman's prints from the archives and compared them to the previously unidentified prints. After confirming that Merriman's fingerprints matched eighteen fingerprints found in the victim's apartment, Messick notified the prosecutor, who, in turn, immediately notified defense counsel. Defense counsel deposed Messick two days later and the State sought to present Messick's testimony a week later.
The record reflects that the fingerprint expert was not acting on the State's request or at the direction of the State when he independently tried to match the unidentified fingerprints to someone other than the victim. Further, the State immediately disclosed its results to defense counsel once the State was informed of Messick's analysis. Thus, we find that the trial court did not abuse its discretion in finding no discovery violation on the part of the State.
Even if there was a discovery violation, however, we find no error by the trial court in concluding that appellant's defense was not prejudiced and that any violation was not willful. In fact, because there still remained a substantial number of unidentified prints, even after Messick's further analysis, the defense's third party theory could still be asserted. Also, Messick's ultimate conclusion was that none of the latent fingerprints recovered from the victim's apartment matched appellant's fingerprints, a fact helpful to the defense.

Walker Burglary
As we noted above, claim three relating to the admission of evidence of the Walker burglary was not preserved for appeal. Nevertheless, even if it were preserved, it would be without merit. In Florida, evidence of other crimes, wrongs and acts is admissible if it is relevant (i.e., it is probative of a material issue other than the bad character or propensity of an individual). Charles W. Ehrhardt, Florida Evidence § 404.9, at 156 (1995 ed.). See Hartley v. State, 686 So.2d 1316, 1320 (Fla.1996) (citing Griffin v. State, 639 So.2d 966 (Fla.1994)) (both stating that evidence of other crimes which are "inseparable from the crime charged" is admissible under section 90.402).
The Walker burglary was closely connected to the murder of Pezza and was part of the entire context of the crime. When the police caught appellant burglarizing the Walker residence, they found Pezza's checkbook on his person. It was also as a result of the Walker burglary that police placed appellant in custody. Furthermore, appellant was in jail for this burglary when he placed the incriminating call to his mother and stated that the police were going to implicate him in a murder.
Appellant also claims that the State improperly argued the collateral burglary as similar fact evidence in closing argument to the jury. Under section 90.107, Florida Statutes (1995), evidence that is admissible for one purpose may be inadmissible for another purpose. See Parsons v. Motor Homes of America, Inc., 465 So.2d 1285, 1290 (Fla. 1st DCA 1985). Consequently, it is error to take the position that once material "is received in evidence, it will be received for any probative value it may have on any issues before the court." Id.
As discussed above, the trial court properly admitted details of the Walker burglary because it was inextricably intertwined with the instant murder. However, the Walker burglary was never admitted as similar fact evidence during the trial. Nevertheless, during closing argument, the prosecutor pointed out the similarities between the Walker burglary and the Pezza burglary/murder. This argument by the prosecutor was improper. The State's claim that it was simply arguing facts elicited during the trial and drawing legitimate inferences from them is not availing. The State's use of the facts from the Walker burglary exceeded the scope for which they were admitted  i.e., to establish the entire context out of which the criminal action occurred.
Nevertheless, we find this error harmless. Throughout the trial, the jury was presented with evidence of both the Pezza *814 burglary and the Walker burglary, mostly without objection. This evidence was not erroneously admitted.[10] Moreover, the similarities between the two crimes were not made a feature of the trial. Thus, while the prosecutor's comments were error, they were harmless. See State v. DiGuilio, 491 So.2d 1129, 1138-39 (Fla.1986).

Prosecutor's Argument
Next, appellant claims that the trial court erred by allowing the State during its closing argument to rebut a suicide defense which the State believed was raised by the defense's case. Relying on Bayshore v. State, 437 So.2d 198 (Fla. 3d DCA 1983), and Brown v. State, 524 So.2d 730 (Fla. 4th DCA 1988), Consalvo contends that the prosecutor improperly set up a "strawman" defense in order to knock it down.
We find no error and find this case distinguishable from Bayshore v. State, 437 So.2d 198 (Fla. 3d DCA 1983), and Brown v. State, 524 So.2d 730 (Fla. 4th DCA 1988). In Bayshore, the prosecutor himself created the strawman (defense) and then proceeded to knock it down. Specifically, the defendant in Bayshore filed no notice of alibi and did not even hint at an alibi defense during the trial. Nevertheless, during the trial, the prosecutor elicited testimony from the arresting officer which supported an alibi defense. 437 So.2d at 199. During closing argument, the prosecutor told the jury to use its common sense and rhetorically asked: "[I]f [Bayshore] was at home with his father as he told [the officer], where's the one person who can corroborate that?" The Bayshore court found that the prosecutor's comments required a new trial since the whole issue of alibi was raised by the State and the comments may have led the jury to believe that defendant had the burden of proving his innocence. Id. at 199-200.
Similarly, in Brown v. State, 524 So.2d 730 (Fla. 4th DCA 1988), the prosecutor improperly attempted to create an alibi defense for the defendant and then commented on the defendant's failure to call alibi witnesses. See also Lane v. State, 459 So.2d 1145 (Fla. 3d DCA 1984)(holding where whole issue of alibi was raised by state, prosecutor's repeated improper comments on defendant's failure to call alibi witnesses was prejudicial error). The Fourth District found that "but for the prosecutor's creation of the impression that alibi witnesses existed ... there would not have been even a hint as to the existence of a possible alibi defense." Brown, 524 So.2d at 731.
Unlike the prosecutors in Brown and Bayshore, the prosecutor in this case did not manufacture the suicide defense out of whole cloth. In fact, although defense counsel equivocated on the issue of whether a suicide defense was going to be advanced,[11] the testimony he elicited on cross-examination and the evidence he requested pretrial on this issue contradicted his statements.[12] The appellant effectively opened the door to prosecutorial *815 comment on suicide since the testimony elicited by defense counsel on crossexamination suggested a potential suicide defense. Cf. Biondo v. State, 533 So.2d 910 (Fla. 2d DCA 1988)(holding state did not prematurely rebut defendant's entrapment defense where state introduced evidence in anticipation of entrapment defense after defendant had inserted defense into case through opening statement and defense counsel's cross-examination of state witness). Under the circumstances here, a jury could have reasonably believed that an issue of suicide was raised by the defense. Accordingly, the trial court did not err.

Jury Instructions
The last error claimed by the appellant during the guilt phase is that the trial court erred in instructing the jury that proof of unexplained possession of recently stolen property by means of burglary may justify a conviction for burglary. In this case, the trial court read the following instruction to the jury:
Proof of unexplained possession by an accused of property recently stolen by means of a burglary may justify a conviction of burglary with intent to steal that property if the circumstances of the burglary and of the possession of the stolen property, when considered in the light of all of the evidence in the case, convince you beyond a reasonable doubt that the defendant committed the burglary.
See Fla.Std.Jury Instr. (Crim.) 136.[13]
As with all jury instructions, there must be an appropriate factual basis in the record in order to give this instruction. See, e.g., Griffin v. State, 370 So.2d 860, 861 (Fla. 1st DCA 1979) (holding that in prosecution for burglary it was reversible error to give instruction regarding possession of stolen property when evidence did not disclose that defendant was ever in possession of the property). This means two things. First, it must be shown that the defendant, when arrested, either failed to explain or gave an incredible or unbelievable explanation for his possession of the property. Id. Second, the instruction applies only where the property is undisputedly stolen and the question is who stole it. See Jones v. State, 495 So.2d 856, 857 (Fla. 4th DCA 1986). "[W]here there is conflict in the evidence as to the intent with which property alleged to have been stolen was taken ... the question should be submitted to the jury without any intimation from the trial court as to the force of presumptions of fact arising from ... the testimony." Curington v. State, 80 Fla. 494, 497, 86 So. 344, 345 (1920). It is improper to give this instruction when its only possible effect is to allow the jury to presume that a defendant is guilty because he was in possession of the property. This goes against the presumption of innocence inherent in our criminal justice system. Jones, 495 So.2d at 856.
In this case, appellant argues that the instruction could lead the jury to conclude appellant was guilty of burglary by his innocent possession of a canvas bag and checkbook that were not shown to have been stolen from the victim's residence. Appellant was also videotaped using the victim's ATM card and was seen driving the victim's car several days before the victim's body was found. At trial or upon arrest, appellant failed to explain his possession of the victim's checkbook, canvas bag, ATM card, and car. We find there was sufficient evidence in the record that these items were recently stolen to justify the instruction given by the court.
We also find Jones inapplicable to this case. In Jones, there was a clear danger that the instruction would be improperly used. The car in Jones was not undisputedly stolen; in fact, the only issue at trial was whether the defendant intended to steal or innocently took a car from a car dealer. 495 So.2d at 857. That danger is not present here. All the evidence indicates that the victim's property observed or found in appellant's possession was stolen. As the trial court stated: "There is no evidence to indicate that that property was stolen at some other time than at the time of the burglary  at the time of the burglary of the victim's *816 residence." Consequently, we find that the trial court did not err in giving the "unexplained possession" jury instruction.
Even if it were error for the trial court to have given the instruction, we would find it harmless beyond a reasonable doubt. The evidence against appellant was overwhelming, and we find no reasonable possibility that the giving of the instruction affected the outcome. Appellant lived with his mother, who lived next door to the victim. Appellant knew the victim and had been in her apartment on several occasions. Appellant also was aware that the victim's live-in boyfriend had recently died, leaving her alone in her apartment. Prior to the victim's body being found, appellant was observed with various items of the victim's personal property. During that time, appellant was filmed on three different days making withdrawals from the victim's bank account using her ATM card and was also observed driving the victim's car. Appellant's mother saw appellant carrying a beach bag that belonged to the victim. Cards found in the victim's bedroom and bathroom matched playing cards found in the beach bag which was ultimately retrieved from a nearby dumpster. Upon the appellant's arrest for burglary, appellant was found in possession of one of the victim's checkbooks.
Appellant also made numerous incriminating statements. When appellant called his mother from jail for the unrelated burglary, he told her he was going to be implicated in a murder. When his mother told him that the police were in the victim's apartment, appellant replied, "Oh, shit." When the police asked appellant about his possession of the victim's checkbook, he responded, "[Y]ou are not going to pin that stabbing on me." At that point, the police did not know that the victim had been stabbed. Appellant told another jail inmate that he went to the victim's apartment and broke in to get drugs knowing the victim was home but unconscious. After he entered the victim's apartment, she awoke and started yelling at him to get out and that she was going to call the police. She reached for the telephone so he grabbed her. She screamed and he stabbed her. When she screamed louder, he stabbed her several more times.
Finally, pursuant to a search warrant, the police found a towel in appellant's dresser drawer. Blood on the towel, which had been transferred from a hand onto the towel while the blood was still wet, matched the victim's DNA pattern. Based on this evidence, we feel that there is no reasonable possibility that the verdict would have been different had the instruction not been given. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

Sufficiency of Evidence
The sufficiency of the evidence has not been directly challenged in this case. However, our review of the evidence as outlined above demonstrates that there was sufficient evidence to support Consalvo's convictions for first-degree murder and armed burglary. Accordingly, finding no reversible error during the guilt phase of the trial, we affirm Consalvo's convictions.

Penalty Phase
Appellant claims that the victim-impact testimony of the victim's brother should not have been admitted and that the prosecutor used the victim-impact evidence improperly. We disagree. Section 921.141(7), Florida Statutes (1995), which establishes the permissible bounds of victim-impact evidence, states:
Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as part of victim impact evidence.
After reviewing the testimony of the victim's brother, we conclude that it did not violate the dictates of section 921.141(7).
Appellant also claims that the prosecutor improperly used victim-impact evidence in his opening and closing penalty-phase argument. Since appellant failed to object at the trial, he has failed to preserve this point for appeal. Sims v. State, 444 So.2d 922, 924 (Fla.1983), cert. denied, 467 U.S. 1246, 104 *817 S.Ct. 3525, 82 L.Ed.2d 832 (1984); see also Johnson v. State, 660 So.2d 637, 646 (Fla. 1995) (finding defendant's contention that state made improper closing argument was not preserved for appeal, where counsel did not object until after jury had been given its instructions and retired to deliberate), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996). Even if it had been preserved for appeal, however, we would find that appellant's claim fails on the merits.
Next, appellant claims that the trial court's sentencing order relied on testimony and deposition statements not presented in open court and thereby violated his due process rights. In Porter v. State, 400 So.2d 5 (Fla.1981), the trial court based a "substantial portion" of its findings as to two aggravators on the testimony of an acquaintance of the appellant. However, even though the acquaintance testified at trial, the trial court's critical findings came from the acquaintance's deposition testimony which differed from that presented at trial. "The trial judge never advised the appellant of his intention to utilize the deposition and never afforded the appellant an opportunity to rebut, contradict, or impeach the deposition testimony." Id. at 7. Extending the holding in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), we concluded that when a sentencing judge intends to use any information not presented in open court as a factual basis for a sentence, he must advise the defendant of what it is and afford the defendant an opportunity to rebut it. Porter, 400 So.2d at 7. Because the trial judge sentenced Porter to death, relying in part on information not presented in open court and not proved at trial, we found the trial judge deprived Porter of due process of law. Id.
In this case, the trial court's sentencing order quotes two statements from depositions which were never presented in open court. The first quote, taken from Officer Hopper's deposition, concerned a statement made by the victim to Officer Hopper. The victim stated to Hopper that "she was a little scared of Robert [the appellant]." The second quote was taken from Detective Doethlaff's deposition, where he stated that he told the defendant that, "she was there, you were there. You're going to have to go to court over it and she wants to take action."
The trial court also stated that the "Defendant's girlfriend, Gail Russell, testified that during the period of September 27, 1991 until approximately September 30, 1991 the Defendant drove the victim's vehicle and had the keys to the vehicle in his possession." Gail Russell did not testify during the guilt phase, but she did testify during the penalty phase. Although we find that it was error for the trial court to utilize these out-of-court deposition statements, we find these errors are harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Unlike the situation in Porter, the trial court here made reference to facts which were established at trial by evidence other than that referred to in the sentencing order.
First, as for the victim's statement that she was a little scared of the appellant, the evidence at trial revealed that the victim identified the appellant as a suspect in the theft of her money and keys. On September 26, 1990, the victim told her brother that she was feeling "down" because appellant had stolen her money and keys. She indicated that she had made arrangements to have her locks changed, that she had called the police, and that she had spoken to appellant's mother about the situation. The following day, a locksmith changed the locks on the victim's apartment door and mailbox. From this testimony, the judge and jury could have easily inferred, without reference to Officer Hopper's deposition, that the victim was "a little scared" of appellant. Second, Doethlaff's trial testimony essentially paralleled his deposition quote.[14] *818 Gail Russell did testify at the penalty phase, although not to all the matters referred to by the trial court. She testified about being in the victim's car with appellant when he went to the ATM, as well as testifying to the fact that appellant was without money until this crime occurred. The substance of her statement was also substantiated by several trial witnesses. Real Favraeau, a motel manager, testified he saw appellant driving a maroon car on September 30, 1990, which was "similar" to Pezza's car. Detective Gill testified that he found the victim's car on October 8, 1990, parked just south of Mr. Favraeau's motel. Detective Gill took Ms. Russell to the site and they located the keys to the car in the backyard of a nearby house. Additionally, James Andrews authenticated photographs taken from videotapes which recorded appellant withdrawing money from the victim's bank account from various ATM machines.
Therefore, although the trial court erred in referring to deposition testimony, the trial court did not actually rely on any information that was not otherwise proven during trial. That was not the case in Porter. We find the violation was harmless beyond a reasonable doubt and that the error complained of did not contribute to the sentence of death. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).

Mitigating Circumstances
As his next claim, appellant argues that the trial court erred in assessing certain nonstatutory mitigating circumstances. Specifically, appellant claims that the following nonstatutory mitigating circumstances were uncontroverted and should have been considered and found by the trial court: (1) appellant has a potential for rehabilitation; (2) appellant is amenable to learning and has the ability to learn; (3) appellant has some positive personality traits; and (4) if appellant had been raised in a different environment, his behavior might have been different.
In Lucas v. State, 568 So.2d 18 (Fla.1990), we stated: "[T]he defense must share the burden and identify for the court the specific nonstatutory mitigating circumstances it is attempting to establish." Id. at 24. Unlike statutory mitigation that has been clearly defined by the legislature, nonstatutory mitigation may consist of any factor that could reasonably bear on the sentence. The parameters of nonstatutory mitigation are largely undefined. This is one of the reasons that we impose some burden on a party to identify the nonstatutory mitigation relied upon. Appellant has not met this burden with respect to mitigating circumstances numbers (1) and (4) above. Appellant neither presented these circumstances to the jury nor to the trial court. Therefore, we find no error by the trial court in not expressly considering or finding these as nonstatutory mitigators.
As to mitigating circumstances numbers (2) and (3), we also find no error. A trial court may reject a defendant's claim that a mitigating circumstance has been proven, provided that the record contains competent, substantial evidence to support the trial court's rejection of the mitigating circumstances. Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990); see also Cook v. State, 542 So.2d 964, 971 (Fla.1989) (trial court's discretion will not be disturbed if the record contains "positive evidence" to refute evidence of the mitigating circumstance). In this case, appellant's amenability to learning was specifically considered by the trial court in its sentencing order and not found because of controverting evidence. The same goes for the appellant's assertion that he had some positive personality traits.
Appellant also urges that the trial court used the wrong standard in assessing the mitigating circumstance of his turbulent family history, which it accorded very little weight. The trial court found this mitigating circumstance and accorded it "very little weight." It did not reject this mitigating circumstance as a result of what the appellant claims is an improper standard. It is mere speculation whether the trial court would have accorded the circumstance more weight had it used a different standard. The trial court concluded that: "Although there may have been some abuse by his father *819 when he was younger it does not appear to this Court that this murder stems from that abuse or childhood trauma, rather, it appears to have been prompted by purely selfish motives." Mitigating circumstances are defined as "factors that, in fairness or in the totality of the defendant's life or character may be considered as extenuating or reducing the degree of moral culpability for the crimes committed." Jones v. State, 652 So.2d 346, 351 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 202, 133 L.Ed.2d 136 (1995); see also Brown v. State, 526 So.2d 903, 908 (Fla.) ("Mitigating evidence is not limited to the facts surrounding the crime but can be anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant."), cert. denied, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 361 (1988). The trial court's decision to find this circumstance but accord it very little weight was within its discretion.

AVOID ARREST AGGRAVATOR
Section 921.145(5)(e), Florida Statutes, defines the "avoid arrest" aggravator. "The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effectuate an escape from custody." The appellant challenges the finding of this aggravator here. Typically, this aggravator is applied to the murder of law enforcement personnel. However, the above provision has been applied to the murder of a witness to a crime as well. Riley v. State, 366 So.2d 19, 22 (Fla.1978). In this instance, "the mere fact of a death is not enough to invoke this factor.... Proof of the requisite intent to avoid arrest and detection must be very strong in these cases." Id. In other words, the evidence must prove that the sole or dominant motive for the killing was to eliminate a witness. Geralds v. State, 601 So.2d 1157, 1164 (Fla.1992); Oats v. State, 446 So.2d 90, 95 (Fla.1984); see, e.g., Harvey v. State, 529 So.2d 1083, 1087 (Fla.1988) (holding murders were committed for purpose of avoiding lawful arrest where defendant was known to victims and defendants discussed in victims' presence the need to kill them to avoid being identified), cert. denied, 489 U.S. 1040, 109 S.Ct. 1175, 103 L.Ed.2d 237 (1989). Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. Scull v. State, 533 So.2d 1137, 1142 (Fla.1988), cert. denied, 490 U.S. 1037, 109 S.Ct. 1937, 104 L.Ed.2d 408 (1989). Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator. Geralds v. State, 601 So.2d 1157, 1164 (Fla.1992); Davis v. State, 604 So.2d 794, 798 (Fla.1992).
Additionally, a motive to eliminate a potential witness to an antecedent crime can provide the basis for this aggravating circumstance. Swafford v. State, 533 So.2d 270, 276 (Fla.1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989). And, it is not necessary that an arrest be imminent at the time of the murder. Id. Finally, the avoid arrest aggravator can be supported by circumstantial evidence through inference from the facts shown. Id. at 276 n.6.
In this case, a witness testified regarding a conversation he had with appellant while in jail:
He went over there one day, and she didn't answer the door, but he knew she was home. He figured she was passed out. So he broke into the house.
While he was in there, she woke up and started yelling she was going to call the cops and get out of her house and this and that. And she reached to grab the phone, and he grabbed her and tried to pull, you know, tried to stop her from calling the cops; and she started screaming, so he said he stuck her. Then she really started screaming, so he stuck her a couple more times.
We conclude that this testimony, coupled with the fact that appellant and victim knew each other, and the appellant was aware that the victim was pressing charges against him for his prior theft, is sufficient to uphold the trial court's finding of the avoid arrest aggravator.
Appellant cites to Garron v. State, 528 So.2d 353 (Fla.1988), to contradict the trial court's finding of this aggravator. But Garron can be distinguished. In Garron, the defendant had been drinking and was in a foul mood on the night of the murder. After one of the victims was shot in the chest, the *820 first victim's daughter ran to a telephone, called the operator, and requested the police. Defendant followed the daughter to the phone, leveled the gun at her, and fired. Id. at 354. We rejected the avoid arrest aggravator because there was no proof as to the true motive for the shooting of the second victim, other than that it involved another family member and immediately followed the mother's shooting. In fact, the motive was unclear. We believed that the fact that the second victim was on the phone at the time of the shooting hardly implied any motive on the defendant's part. Id. at 360. In the instant case, however, the victim threatened to call the police and reached for the phone while appellant was attacking her.
Appellant's reference to Cook v. State, 542 So.2d 964 (Fla.1989), is also inapposite. In that case, we found the defendant's statement that he shot the victim to keep her quiet because she was yelling and screaming was insufficient to support the trial court's finding that the defendant killed the victim to avoid arrest. Rather, the facts indicated that the defendant shot instinctively, not with a calculated plan to eliminate the victim as a witness. Id. at 970. In this case, the victim's screaming was contemporaneous with her threat and actions to call the police.
As an alternative argument, appellant contends that the avoid arrest and felony murder aggravators should be merged. Under the same reasoning in Provence v. State, 337 So.2d 783 (Fla.1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), where we held that in robbery-murders the felony murder and pecuniary gain aggravators should be merged, appellant's claim is without merit. The avoid arrest and felony murder aggravators do not refer to the same aspect of the defendant's crime. See id. at 786. Also, one who commits a capital crime in the course of a burglary will not automatically begin with two aggravating circumstances. See id. Therefore, the trial court did not err in finding the "avoid arrest" aggravating circumstance.

PROPORTIONALITY
Finally, appellant contends that his death sentence is disproportionate. There are two aggravators in this case  avoid arrest and murder committed during the course of a burglary. There are no statutory mitigating circumstances and, as for nonstatutory mitigating circumstances, the trial court gave the appellant's employment history and appellant's abusive childhood "very little weight." We conclude that the existence of the two aggravators is sufficient to outweigh the very little weight given to the nonstatutory mitigating circumstances set forth in the sentencing order. We have previously upheld death sentences in cases where there were two aggravators, no statutory mitigators, and weak nonstatutory mitigation.[15] We have also upheld death sentences where there are two aggravators and no mitigation. See, e.g., King v. State, 436 So.2d 50 (Fla.1983) (affirming imposition of death penalty where there were two aggravators  prior violent felony and heinous, atrocious and cruel  and no mitigation), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 163 (1984). Accordingly, we find that Consalvo's death sentence is not disproportionate to other cases.
We affirm appellant's convictions and the imposition of the sentence of death.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Pezza's medical and psychological records indicate a history of mental illness.
[2] Telephone records indicated that at 7:32 p.m. on October 3, 1991 a collect call was made from the Pompano Jail Annex inmates' phone to Ms. Corropolli's apartment. Consalvo, at this time, was being held at the Pompano Jail Annex.
[3] The twenty claims are: (1) The trial court abused its discretion in finding the state did not commit a discovery violation when it failed to disclose a laboratory's inability to test cigarette butts found in the victim's toilet and when it failed to disclose a letter requesting laboratory analysis on the same evidence; (2) The trial court abused its discretion in ruling that the state did not commit a discovery violation when, after the defense's opening statement, which asserted a third party killing theory, the state informed the defense that the fingerprint expert had identified several previously unidentified prints as belonging to the victim's deceased boyfriend; (3) The trial court abused its discretion in admitting evidence relating to the collateral burglary of Walker's residence; (4) The trial court erred in allowing the state, during guilt-phase closing argument, to argue a collateral burglary as similar fact evidence; (5) The trial court abused its discretion by admitting appellant's statement to the police upon arrest for a collateral burglary (i.e., that he had permission to be in the victim's residence); (6) The trial court abused its discretion by admitting certain out-of-court statements relating to a prior incident between appellant and the victim regarding an alleged theft; (7) The trial court abused its discretion in allowing Eva Bell to testify to statements made by appellant in a telephone conversation with his mother, who then related them to Bell; (8) The trial court erred by allowing the state, during its guilt-phase closing argument, to rebut a suicide defense which the state believed was raised by the defense's case; (9) The trial court erred in instructing the jury that proof of unexplained possession of recently stolen property by means of burglary may justify a conviction for burglary; (10) Constructive amendment of an indictment by instruction and argument on felony murder when the grand jury only charges premeditated murder violates article I, section 15(a) of the Florida Constitution and the Fifth Amendment; (11) Appellant's right to due process was violated and he was denied effective assistance of counsel when the trial court instructed the jury on, and allowed the prosecution to argue, a first-degree felony murder theory when the indictment charged only premeditated first-degree murder; (12) The trial court abused its discretion in admitting the victim-impact testimony of the victim's brother and the prosecutor used victim-impact evidence in an improper manner; (13) The trial court abused its discretion in denying appellant's specially requested penalty-phase jury instructions which specifically defined certain non-statutory mitigating circumstances that appellant believed were applicable in his case; (14) The trial court's sentencing order, which relied on testimony and deposition statements not presented in open court, violated appellant's due process rights; (15) The trial court erred in failing to consider and find certain non-statutory mitigating circumstances and the court applied an improper standard in evaluating the "turbulent family background" mitigating circumstance; (16) The trial court erred in finding the "avoid arrest" aggravating circumstance; (17) Section 921.141 (5)(d), Florida Statutes (1995), which delineates the "felony murder" aggravator, is unconstitutional; (18) Section 921.141(7), Florida Statutes (1995), which authorizes the introduction of victim-impact evidence, is unconstitutional; (19) Death by electrocution is cruel and unusual punishment; and (20) The death penalty is not proportionally warranted in this case.
[4] See Armstrong v. State, 642 So.2d 730 (Fla. 1994), cert, denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995); Lovette v. State, 636 So.2d 1304, 1307 (Fla. 1994); Bush v. State, 461 So.2d 936, 940 (Fla. 1984), cert, denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986); O'Callaghan v. Stale, 429 So.2d 691, 695 (Fla. 1983). As for appellant's ineffective assistance of counsel claim, it is not reviewable on direct appeal and is more properly raised in a motion for post-conviction relief. McKinney v. State. 579 So.2d 80, 82 (Fla.1991).
[5] See, e.g., Finney v. State, 660 So.2d 674, 684 (Fla.1995), cert, denied, ___ U.S. ___, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996); Jones v. State, 612 So.2d 1370, 1375 (Fla. 1992), cert, denied, 510 U.S. 836, 114 S.Ct. 112, 126 L.Ed.2d 78 (1993); Robinson v. State, 574 So.2d 108, 111 (Fla.), cert, denied, 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991).
[6] See, e.g.. Hunter v. State, 660 So.2d 244, 253 & n. 11 (Fla.1995), cert, denied, ___ U.S. ___, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996).
[7] We have explicitly upheld the constitutionality of section 921.141(7) in Maxwell v. State, 657 So.2d 1157 (Fla.1995), approving, 647 So.2d 871 (Fla. 4th DCA 1994). See also Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); Windom v. State, 656 So.2d 432 (Fla.), cert, denied, ___ U.S. ___, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995).
[8] See, e.g., Hunter, 660 So.2d at 253; Cardona v. State, 641 So.2d 361, 365 (Fla. 1994), cert, denied, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995); Fotopoulos v. State, 608 So.2d 784, 794 n. 7 (Fla.1992), cert, denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993).
[9] See Richardson v. State, 246 So.2d 771 (Fla. 1971).
[10] Therefore, the rule announced in Straight v. State, 397 So.2d 903 (Fla.), cert, denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981)  erroneous admission of irrelevant collateral crimes evidence "is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged"  is inapplicable. Id. at 908; see also Castro v. State, 547 So.2d 111, 115 (Fla. 1989); Keen v. State, 504 So.2d 396, 401 (Fla. 1987); Peek v. State, 488 So.2d 52 (Fla.1986).
[11] At one point, defense counsel stated: "Let me say this, that is not our theory in defense in the sense of it is not our purpose to say that it was a suicide. That doesn't mean that areas that come out in this case about potential suicide won't be presented."
[12] Prior to trial, defense counsel obtained the victim's mental health records and had an expert review the victim's psychological background, including the effects of any medication she may have been taking. During trial, defense counsel elicited testimony from Bell that the victim had been hospitalized for a mental illness and that in 1990 she had threatened to kill herself by stabbing herself to death. Defense counsel also elicited testimony from Dr. Wright (1) that there were characteristics of suicide surrounding the victim's death, (2) that the victim's wounds could have been self-inflicted or suicide-assisted, and (3) that suicide was prevalent among people who took Prozac.

At one stage of the trial the trial court allowed defense counsel to cross-examine a witness on certain matters because it was in direct support of a potential defense of suicide. Also, the trial court even believed that a suicide defense was implicitly raised by defense counsel.
[13] Jury instructions referring to the inference arising from the unexplained possession of stolen property have been specifically approved by this Court. See, e.g., Edwards v. State, 381 So.2d 696 (Fla. 1980), and cases cited therein.
[14] Detective Doethlaff testified on direct examination what he told the appellant would happen if Pezza filed charges against him:

I told him, for starters, it was his word against her's because there was not police there at the time of the alleged incident, and it was basically his word against her's. And she evidently wanted to pursue the situation so I was just updating the report. And she stated to me she was intending on filing charges and it would be handled through the courts. She believed he had taken the property, and she wanted it handled through the courts.
[15] See, e.g., Melton v. State, 638 So.2d 927 (Fla.) (holding death sentence not disproportionate where trial court found two statutory aggravators that felony-murder was committed for pecuniary gain and that defendant had been convicted of prior murder, no statutory mitigating factors, and nonstatutory mitigators of good conduct while awaiting trial and difficult family background which were given little weight), cert, denied, 513 U.S. 971, 115 S.Ct. 441, 130 L.Ed.2d 352 (1994); Bowden v. State, 588 So.2d 225 (Fla.1991) (affirming sentence of death where trial court found two aggravators  prior violent felony and heinous, atrocious, or cruel  and the nonstatutory mitigating factor of "terrible childhood and adolescence"), cert, denied, 503 U.S. 975, 112 S.Ct. 1596, 118 L.Ed.2d 311 (1992).