937 So.2d 555 (2006)
Robert CONSALVO, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-520.
Supreme Court of Florida.
May 18, 2006.
Ira W. Still, III, Coral Springs, Florida for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
Robert Consalvo appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the trial court's denial of Consalvo's postconviction motion.

FACTUAL AND PROCEDURAL HISTORY
Consalvo was convicted and sentenced to death for the first-degree murder of Lorraine Pezza. The underlying facts appear in this Court's opinion in Consalvo's direct appeal:
On October 3, 1991, at approximately 12:40 a.m., Nancy Murray observed a man wearing a brown towel over his head cut a screen door and enter the residence of Myrna Walker, who lived downstairs from the victim. Murray called the police and Consalvo was apprehended while burglarizing the apartment. Fresh pry marks were found on a sliding glass door along with a cut porch screen. Assorted jewelry was found lying on the bedroom floor with a screwdriver and towel. When police searched Consalvo, they found checkbooks belonging to Pezza, as well as to Walker, and a small pocketknife. Consalvo was arrested and subsequent to his arrest, Consalvo repeatedly asked the police what his bond would be for this burglary offense and how quickly he could be released.
That same day, Detective Doethlaff went to [the victim, Lorraine] Pezza's apartment to investigate why Consalvo was in possession of her checkbook. Doethlaff observed fresh pry marks on *556 Pezza's front door between the deadbolt and the doorknob. When no one answered the door, which was locked, Doethlaff left a business card at the door requesting Pezza to contact the police. That evening, after Pezza's family had tried unsuccessfully for several days to reach her, Eva Bell, a social worker for the Broward Mental Health Division, went to the victim's apartment to check on her. While at the apartment, Bell encountered Pezza's next-door neighbor, Consalvo's mother, Jeanne Corropolli. Corropolli, who lived with Consalvo, related to Ms. Bell that her son had been arrested earlier that day (for the burglary of Mrs. Walker's apartment). After receiving no response at Pezza's apartment, Bell contacted the police. At 7:16 p.m. Officer Westberry responded to Bell's request to check on Pezza. He knocked on Pezza's apartment door without getting a response and noticed Doethlaff's business card was still in the door jamb. The officer went back to his patrol car to complete his report. Bell, who was still in Corropolli's apartment, testified that shortly after the officer left the apartment, Corropolli was on the phone. Corropolli hung up the phone and became hysterical. Corropolli told Bell that her son, Robert Consalvo, said that he was "involved in a murder." Corropolli testified that when she told her son the police were next door, he replied, "Oh, shit." Bell immediately related this information to Officer Westberry, who then forced open Pezza's apartment door and discovered her decomposing body in the apartment. The porch screens of Pezza's apartment were cut.
At 10:10 p.m., Detective Gill of the Broward Sheriff's Office contacted Consalvo at the Pompano Jail Annex. After advising Consalvo of his rights, Gill notified Consalvo that they wanted to speak to him about Pezza's checks being found on his person at the time of his arrest. Consalvo responded by stating: "[Y]ou are not going to pin the stabbing on me." At this time, Gill did not know that Pezza had been stabbed.
At 2:30 a.m. the next day, Detective Gill effectively arrested Consalvo by filing an add charge against him for the murder of Lorraine Pezza. Consalvo had not yet been released on bond for the burglary charge. When a search warrant was executed on Corropolli's apartment, the police found a bloody towel in a dresser in Consalvo's bedroom. Subsequent DNA testing matched the blood on the towel with the victim's blood. In a statement to the police, Consalvo's mother confirmed that her son had in fact called her from the county jail and had advised her that he might be implicated in a homicide. She further informed police that she had found a towel in her son's room with blood on it.
While incarcerated in the Broward County Jail, Consalvo made inculpatory statements to a fellow inmate named William Palmer. Consalvo told Palmer that he killed Pezza after she caught him burglarizing her apartment and said she would call the police. When she started to yell for help, Consalvo stabbed her. Lorraine Pezza was stabbed three times with five additional superficial puncture wounds. The fatal wound was to the left side of the chest. . . .
On February 11, 1993, appellant was convicted of armed burglary and the first-degree murder of Lorraine Pezza. The jury recommended the death sentence by a vote of eleven to one. The trial court found two aggravating factors: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary, see *557 921.141(5)(d), Fla. Stat. (1995); and (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, see id. 921.141(5)(e). The court found no statutory mitigating circumstances. As for nonstatutory mitigating circumstances it accorded the following "very little weight": (1) appellant's employment history; and (2) appellant's abusive childhood. Because the "mitigating factors have been given very little weight and they in no way offset the aggravating factors," the trial court found the death sentence "fully supported by the record."
Consalvo v. State, 697 So.2d 805, 809-11 (Fla.1996) (footnotes omitted). This Court affirmed Consalvo's conviction and sentence on October 3, 1996, and denied rehearing on July 17, 1997, as revised on denial of rehearing, October 16, 1997.[1]See *558 id. at 805, 809. The United States Supreme Court denied certiorari on May 4, 1998. See Consalvo v. Florida, 523 U.S. 1109, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998). On March 7, 2001, Consalvo filed his amended 3.850 motion.[2] On March 7, 2002, after a Huff[3] hearing, the trial court granted an evidentiary hearing on claims I, II, III, and IV, and summarily denied claims V-XV. On February 19, 2004, the trial court entered a final order denying Consalvo's amended motion for postconviction relief. Consalvo appeals the trial court's summary denial of claims V-XV[4] and also appeals the trial court's rejection of claims I-IV after the evidentiary hearing.

NEWLY DISCOVERED EVIDENCE
The claims in Consalvo's amended 3.850 motion upon which the trial court conducted an evidentiary hearing included: (I) a claim of newly discovered evidence based upon the recanted testimony of Mark DaCosta; (II) a claim of newly discovered evidence based upon the recanted testimony of William Palmer; (III) a claim that the State failed to disclose exculpatory evidence *559 that Assistant State Attorney (ASA) Brian Cavanagh had improperly briefed DaCosta on the particulars of the investigation of Consalvo's case and that DaCosta had in turn passed this information on to Palmer; and (IV) a claim that the State deliberately used false and misleading evidence in the form of DaCosta's and Palmer's testimony during Consalvo's original trial proceedings.
At the evidentiary hearing on his claims that Palmer and DaCosta had recanted their incriminating trial testimony, Consalvo presented the testimony of DaCosta, Palmer, and ASA Ken Farnsworth. The State presented State Attorney Secretary Lisa Gardner, ASA Brian Cavanagh, Detective Frank Ilarraza, and Florida Department of Law Enforcement (FDLE) Special Agent Audrey Jones. After conducting an evidentiary hearing, the trial court found that the recantations were not credible and that the claims based on the truth and credibility of the recantations should be denied.
Consalvo first argues that the trial court erred in rejecting claims I and II by concluding after an evidentiary hearing that the recanted testimony of witnesses DaCosta and Palmer was not credible. He argues that if Palmer's testimony were excised from the trial, the result of both the guilt phase and penalty phase of Consalvo's trial would have been different.[5]
In our opinion on direct appeal, this Court described Palmer's trial testimony as follows: "While incarcerated in the Broward County Jail, Consalvo made inculpatory statements to a fellow inmate named William Palmer. Consalvo told Palmer that he killed Pezza after she caught him burglarizing her apartment and said she would call the police. When she started to yell for help, Consalvo stabbed her." Consalvo, 697 So.2d at 810. This Court also referred to Palmer's testimony in reviewing and upholding the "avoid arrest" aggravator:
In this case, a witness testified regarding a conversation he had with appellant while in jail:
[Consalvo] went over there one day, and she didn't answer the door, but he knew she was home. He figured she was passed out. So he broke into the house.
While he was in there, she woke up and started yelling she was going to call the cops and get out of her house and this and that. And she reached to grab the phone, and he grabbed her and tried to pull, you know, tried to stop her from calling the cops; and she started screaming, so he said he stuck her. Then she really started screaming, so he stuck her a couple more times.
Id. at 819.
DaCosta testified at the evidentiary hearing that ASA Cavanagh gave him all the information he knew about the Consalvo case when he met with ASA Cavanagh at the State Attorney's office while he was being held at the Broward County Jail. He stated that during this meeting, ASA Cavanagh said there was an important murder case for which he needed a conviction, showed DaCosta crime scene photos, and said that if DaCosta would help the State by soliciting another jail inmate to testify, he would get a guideline sentence in his own case "no matter what happened in [DaCosta's] case." DaCosta was later given a guideline sentence in his case but was also declared a habitual offender. DaCosta *560 testified that after meeting with ASA Cavanagh, he contacted other law enforcement authorities to say he had information on a murder, and he gave a statement to Broward County Sheriff's deputies. DaCosta stated he also provided details of the case to Palmer, who subsequently testified at trial. In August 2000, DaCosta met with Consalvo's investigator and broke down and told him he had lied in testifying and incriminating Consalvo. He then wrote the Governor twice, again asserting that he had lied concerning the Consalvo case. He also signed an affidavit stating that he had lied, although he did not mention ASA Cavanagh in the affidavit.
During the postconviction hearing, when asked about numerous facts that he knew about the case, DaCosta stated he did not hear those facts from Consalvo, and he denied overhearing any of Consalvo's phone conversations. He stated that he only had conversations with Consalvo "about his girlfriend, things in general." When asked about more specific facts that he had described previously, DaCosta's responses were consistently, "I don't remember" or "I don't know," or "I made it up." When asked if the affidavit he signed in Consalvo's attorney's presence was true, he replied, "I don't know." DaCosta admitted that he has been labeled a snitch, has a psychiatric history including hallucinations, schizophrenia, and brain dysfunction, and had taken many psychotropic drugs.
Palmer testified that he was extremely reluctant to testify at the postconviction evidentiary hearing. Prior to Consalvo's trial, Palmer had been facing a habitual offender sentence for battery on a law enforcement officer and possession of cocaine, but because of his assistance in the Consalvo matter, he received a misdemeanor probationary sentence. At the time of Consalvo's trial, Palmer was no longer facing any charges.
Palmer learned from an investigator for the defense seven years after his trial testimony, while an inmate at a prison mental health institute, that Consalvo had been sentenced to death. The defense investigator told Palmer that his testimony put Consalvo on death row. Palmer told the investigator that his testimony had been untrue. He stated he did not want to be responsible for anyone being on death row and did not want to be labeled a snitch. He stated, "I don't think he should be on death row, though, and if any statement that he told me he stabbed her put him there, then I'm wrong. I don't think he ever told me he stabbed her." Finally, he admitted that he would lie to avoid being labeled a snitch. When he met with Consalvo's postconviction attorney, he signed an affidavit that his testimony at trial was derived from conversations with DaCosta, not Consalvo. However, he testified that he still believed that Consalvo committed the murder.
He admitted during his testimony at the evidentiary hearing that Consalvo, DaCosta, and he would talk while in jail together, and Palmer admitted having conversations with Consalvo about his case. He stated that Consalvo told him a lot about the victim, that Consalvo had said he broke into the victim's house and stole checks and car keys, and that Consalvo was going into the victim's house to get drugs. He also admitted that Consalvo told him the police had found one of the victim's checks in his pocket, and that Consalvo told him the police were saying he stabbed the victim "a whole bunch of times." Despite his recollection of this information coming from Consalvo, he could not remember Consalvo telling him about the actual murder.
*561 Since testifying at the Consalvo trial, Palmer has been in a mental health facility. He has a bad memory, he takes psychotropic drugs that affect his memory, and his ears ring. He also hears voices and considers himself to be crazy "in other people's eyes." Voices warned him not to get involved in any aspect of Consalvo's trial. The day he testified, he smoked a marijuana joint and had three beers during the lunch break.
ASA Cavanagh testified that he had been an Assistant State Attorney for over twenty-five years. He specifically denied ever meeting with DaCosta before a brief meeting conducted prior to DaCosta's grand jury testimony. In fact, he asserted that he was not the assigned prosecutor on the Consalvo case and was actually covering the grand jury hearing for the assigned prosecutor due to scheduling conflicts. He also testified that he never met with DaCosta in jail or at the State Attorney's office. He first met DaCosta and Palmer the day of the grand jury, and he stated that while DaCosta indicated he wanted to speak to him about the case, ASA Cavanagh avoided the issue. His only preparation for their testimony was telling both men to tell the truth, and he never promised either of them anything for their testimony or cooperation.
Following the evidentiary hearing, the trial court denied postconviction relief, rejecting the recanted testimony of DaCosta and Palmer as "not credible" and finding Palmer's testimony at the evidentiary hearing to be "bizarre and totally unworthy of belief." The trial court stated, "It is clear to the Court that Palmer's testimony at a new trial would not render probable a different verdict or different sentence." The trial court also rejected Consalvo's claims of improper conduct by the State and found that "there is no credible evidence that either DaCosta or Palmer had been briefed by the State as to any information regarding the Pezza murder investigation against Robert Consalvo and, therefore, the State did not fail to disclose exculpatory evidence."
In Jones v. State, 591 So.2d 911 (Fla. 1991), this Court redefined the test for the granting of a new trial based upon newly discovered evidence from the prior strict requirement that the new evidence must "`conclusively' affect the verdict" to requiring a showing that the new "evidence would `probably' affect the verdict." Spaziano v. State, 660 So.2d 1363, 1365 (Fla. 1995) (citing Jones, 591 So.2d at 915). In Armstrong v. State, 642 So.2d 730 (Fla. 1994), this Court specified the standard for granting a new trial based upon a claim of newly discovered evidence that a witness called on behalf of the prosecution at trial has recanted his or her testimony:
Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. Brown v. State, 381 So.2d 690 (Fla.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); Bell v. State, 90 So.2d 704 (Fla.1956). In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. [Bell, 90 So.2d at 705]. "Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury." [Id.] (quoting Henderson v. State, 135 Fla. 548, 561, 185 So. 625, 630 (1938) (Brown, J., concurring specially)). Only when it appears that, on a new trial, the witness's testimony will change to such an extent *562 as to render probable a different verdict will a new trial be granted. Id.

Id. at 735. We have also held that "[a]bsent an abuse of discretion, a trial court's decision on a motion based on newly discovered evidence [including a witness's newly recanted testimony] will not be overturned on appeal." Mills v. State, 786 So.2d 547, 549 (Fla.2001) (citing Woods v. State, 733 So.2d 980 (Fla.1999); State v. Spaziano, 692 So.2d 174 (Fla.1997); and Parker v. State, 641 So.2d 369 (Fla.1994), and further holding that the trial court did not abuse its discretion in finding that a witness's new version of events would not have probably produced acquittal). We find no abuse of discretion by the trial court in rejecting as not credible the alleged newly discovered evidence presented by Consalvo and in determining that Consalvo had not established an entitlement to a new trial under the Jones standard.
We rejected a similar claim of error in Sochor v. State, 883 So.2d 766 (Fla.2004), where the defendant claimed that the prosecutor offered a witness immunity in exchange for his testimony. Id. at 785. He also claimed that the prosecutor told the witness not to mention important facts in his testimony. Id. at 785-86. The prosecutor testified at the evidentiary hearing that he never offered the witness immunity and that he never told the witness to leave out facts in his testimony. Id. "The circuit court found [the witness]'s evidentiary hearing testimony to be `unreliable and not credible.' On the other hand, it found [the prosecutor]'s testimony to be `candid, trustworthy, and credible'" and that the defendant was simply arguing on appeal "that the circuit court's finding of fact was incorrect." Id. at 785. This Court deferred to the circuit court's resolution of the issue because its finding was "supported by competent, substantial evidence." Id. (citing Kight v. Dugger, 574 So.2d 1066, 1073 (Fla.1990)). In fact, the only evidence for the allegation that the prosecutor had told the witness to leave out facts in his trial testimony was the witness's evidentiary hearing testimony, which directly contradicted his trial testimony and the prosecutor's evidentiary hearing testimony. Id. at 786 ("We cannot say that the circuit court's decision to discredit [the witness]'s evidentiary hearing testimony was unreasonable or unsupported.").
Similarly, in the present case, Consalvo's claim is that the trial court erred in not finding DaCosta's and Palmer's recanted testimony credible and instead finding the testimony of the State's witness, ASA Cavanagh, to be credible and reliable. There is competent, substantial evidence to support the trial court's resolution of this matter, including the trial court's assessment of both DaCosta's and Palmer's history of lying and psychiatric deficiencies and their inconsistencies and lack of memory when testifying at the evidentiary hearing, as well as the contrary testimony of ASA Cavanagh. See Spaziano, 692 So.2d at 175 ("This Court, as an appellate body, has no authority to substitute its view of the facts for that of the trial judge when competent evidence exists to support the trial judge's conclusion."); Kight, 574 So.2d at 1073 ("While there was conflicting testimony concerning whether the state made concessions in exchange for the informants' testimony, it was within the trial court's discretion to find the state's witnesses more credible than those of the defense.").
Consalvo also argues that if Palmer's recanted testimony cannot be believed, it would be difficult to conclude that Palmer's trial testimony is believable. However, we find that to be an improper hindsight analysis, based exclusively upon the current testimony of Palmer that the trial *563 court has rejected as not credible. In addition, of course, there is other credible evidence to support Consalvo's conviction, on which the trial court was entitled to rely in rejecting the Jones claim. This evidence was listed in Consalvo's direct appeal and includes the victim suspecting Consalvo of taking her keys and money; the victim changing the locks at her apartment; Consalvo using the victim's ATM card and driving a car similar to the victim's; Consalvo's possessing checkbooks belonging to the victim; Consalvo's mother, who lived next door to the victim, saying that Consalvo had told her "that he was `involved in a murder,'" and that when she told Consalvo "the police were next door, he replied, `Oh, shit;'" Consalvo stating, "[Y]ou are not going to pin the stabbing on me" to a detective who was not yet aware the victim had been stabbed; and the police finding "a bloody towel in a dresser in Consalvo's bedroom" that subsequent DNA testing matched to the victim's blood. Consalvo, 697 So.2d at 809-10. When all of this evidence is considered together with the trial court's determination of the lack of credibility of DaCosta's and Palmer's postconviction recantations, it becomes apparent that the trial court did not err in rejecting Consalvo's claims.
Because we affirm the trial court's rejection of DaCosta's and Palmer's recanted testimony, we must also reject Consalvo's argument that the trial court erred in not considering Palmer's recanted testimony to be newly discovered evidence with regards to the "avoid arrest" aggravator sufficient to merit a new penalty phase proceeding.

Claims III and IV
For the same reasons we reject Consalvo's claims of error in the trial court's resolution of his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), claims. In view of the trial court's findings as to the credibility of Palmer and DaCosta and the trial court's acceptance of the credibility of the State's evidence, we find that there existed no exculpatory evidence regarding this matter that the State should have turned over to the defense, and therefore Consalvo's claim under Brady is meritless. We also conclude that Consalvo's claim that the State committed a Giglio violation is meritless because the trial court did not err in concluding that no misleading testimony in fact existed.

CONCLUSION
In light of the above analysis, we affirm the trial court's denial of all of the claims set out in Consalvo's postconviction motion.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Consalvo argued twenty claims on direct appeal: (1) The trial court abused its discretion in finding the State did not commit a discovery violation when it failed to disclose a laboratory's inability to test cigarette butts found in the victim's toilet and when it failed to disclose a letter requesting laboratory analysis on the same evidence; (2) the trial court abused its discretion in ruling that the State did not commit a discovery violation when, after the defense's opening statement, which asserted a third party killing theory, the State informed the defense that the fingerprint expert had identified several previously unidentified prints as belonging to the victim's deceased boyfriend; (3) the trial court abused its discretion in admitting evidence relating to the collateral burglary of another residence; (4) the trial court erred in allowing the State, during the guilt-phase closing argument, to argue a collateral burglary as similar fact evidence; (5) the trial court abused its discretion by admitting Consalvo's statement to the police upon arrest for a collateral burglary that he had permission to be in the victim's residence; (6) the trial court abused its discretion by admitting certain out-of-court statements relating to a prior incident between Consalvo and the victim regarding an alleged theft; (7) the trial court abused its discretion in allowing a witness to testify to statements made by Consalvo in a telephone conversation with his mother, who then related them to the witness; (8) the trial court erred by allowing the State, during its guilt-phase closing argument, to rebut a suicide defense which the State believed was raised by the defense's case; (9) the trial court erred in instructing the jury that proof of unexplained possession of recently stolen property by means of burglary may justify a conviction for burglary; (10) constructive amendment of an indictment by instruction and argument on felony murder when the grand jury only charges premeditated murder violates article I, section 15(a) of the Florida Constitution and the Fifth Amendment; (11) Consalvo's right to due process was violated and he was denied effective assistance of counsel when the trial court instructed the jury on, and allowed the prosecution to argue, a first-degree felony murder theory when the indictment charged only premeditated first-degree murder; (12) the trial court abused its discretion in admitting the victim-impact testimony of the victim's brother, and the prosecutor used victim-impact evidence in an improper manner; (13) the trial court abused its discretion in denying Consalvo's specially requested penalty-phase jury instructions which specifically defined certain nonstatutory mitigating circumstances that Consalvo believed were applicable in his case; (14) the trial court's sentencing order, which relied on testimony and deposition statements not presented in open court, violated Consalvo's due process rights; (15) the trial court erred in failing to consider and find certain nonstatutory mitigating circumstances, and the court applied an improper standard in evaluating the "turbulent family background" mitigating circumstance; (16) the trial court erred in finding the "avoid arrest" aggravating circumstance; (17) the statute delineating the "felony murder" aggravator is unconstitutional; (18) the statute authorizing the introduction of victim-impact evidence is unconstitutional; (19) death by electrocution is cruel and unusual punishment; and (20) the death penalty is not proportionally warranted in this case. Consalvo, 697 So.2d at 811 n. 3. With the exception of its conclusions that the prosecutor's mention of the similarities between the murder and a subsequent burglary during closing argument, that jury instructions that proof of the unexplained possession of property recently stolen justified a burglary conviction, and that the trial court's quoting of two statements never presented in open court in its sentencing order all constituted harmless error, this Court found no error and affirmed the death sentences.
[2] The motion was Consalvo's second amended motion, but constituted his first motion for postconviction relief. The claims in Consalvo's amended 3.850 motion were: (I) newly discovered evidence, the recanted testimony of Mark DaCosta; (II) newly discovered evidence, the recanted testimony of William Palmer; (III) the State failed to disclose exculpatory evidence that Assistant State Attorney (ASA) Brian Cavanagh had briefed Mark DaCosta on the particulars of the investigation of Consalvo's case and that DaCosta had in turn briefed William Palmer; (IV) the State deliberately used misleading testimony in the form of DaCosta's and Palmer's testimony during Consalvo's original trial proceedings; (V) the State withheld material and exculpatory evidence in the form of fiber evidence, cigarette butts, fingerprints, and a section of a knife blade; (VI) the trial court failed to determine whether Consalvo knowingly, intelligently, and voluntarily waived his right to testify at the guilt phase of his trial; (VII) the trial court failed to determine whether Consalvo knowingly, intelligently, and voluntarily waived his right to testify at the penalty phase of his trial; (VIII) the trial court failed to determine whether Consalvo knowingly, intelligently, and voluntarily waived his right to testify at both the guilt phase and the penalty phase of his trial; (IX) the trial court failed to require comparative evidence on proportionality, thereby violating Equal Protection; (X) new mitigation evidence has arisen since trial; (XI) the trial court permitted undue prejudice by failing to control the antics at trial of the victim's brother, a prominent Watergate prosecuting attorney; (XII) Consalvo's fundamental right to trial was threatened and there was vindictiveness in his sentencing; (XIII) Florida's death penalty law is unconstitutional on its face and in effect; (XIV) Florida's sentencing law is unconstitutional because it fails to properly narrow the class of persons eligible for the death penalty and because Consalvo's death sentence is predicated on an automatic aggravator (felony murder/murder was committed in the course of a burglary); and (XV) Florida's sentencing law is unconstitutional because victim impact evidence is necessarily discriminatory.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] We find no error in the trial court's summary resolution of claims V through XV. Claims V through XV were either insufficiently pled, procedurally barred because they could have been or were raised on direct appeal, or meritless on their face. Claim V was insufficiently pled and was raised and resolved on direct appeal. Claims VI-VIII, X, XI, and XIII-XV could have been properly raised on direct appeal. See Hall v. State, 742 So.2d 225, 226 (Fla.1999) ("Issues that could have been raised on direct appeal but were not are noncognizable claims through collateral attack."). Claim XII was insufficiently pled and could have been raised on direct appeal. Claim IX was actually reviewed by this Court on direct appeal. See Consalvo, 697 So.2d at 820 ("[W]e find that Consalvo's death sentence is not disproportionate to other cases.").
[5] While Palmer testified at the grand jury and during Consalvo's trial, DaCosta only testified at the grand jury.