# Supreme Court of Florida

---

No. SC19-428

---

**JOHNATHAN I. ALCEGAIRE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 9, 2021

PER CURIAM.

Johnathan Alcegaire appeals his judgments of conviction of first-degree murder and sentences of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. Alcegaire was convicted and sentenced to death for his role in a 2016 triple homicide in Polk County. We affirm Alcegaire's convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

### The Incident

The evidence presented at trial established the following. At the time of the murders, David Washington, Eneida Branch,

Angelica Castro, and Felix Campos lived in a residential unit located at 2314 East Magnolia Street in Lakeland. The residence was part of a triplex multi-unit dwelling. Washington and Branch were dating and had lived in the residence the longest. Castro lived in the residence for about two days before the murders. Campos, the sole survivor of the 2016 incident, met Washington in the summer of 2015 and lived with Washington and Branch for about two weeks before the murders.

On the morning of January 6, 2016, all four residents were at home. Washington, Branch, and Castro had returned home around 4 a.m. after a brief trip to Miami. Around 6 a.m., Campos lay in his bed, and through the bedroom window, saw a van pull into the driveway. Three men got out of the van, knocked on a door leading directly from the outside into Washington's bedroom, and entered the residence after Washington opened the door for them.

Washington and the men then moved from Washington's bedroom into the living room. Campos was able to see into the living room because a towel that hung on his bedroom door caused the door to remain ajar.

Campos heard the men talking with Washington. Campos recognized the men, two of whom were later identified as Alcegaire and Jamaal Smith, from a recent visit to the residence. At one point, Alcegaire walked into Campos's bedroom and walked back into the living room after attempting to close the bedroom door. Shortly thereafter, Smith walked into Campos's bedroom and shot Campos in the face with a nine-millimeter firearm. Smith left Campos's bedroom while Campos remained in bed and bled profusely. The bedroom door remained open, and Campos saw Smith counting Washington's money and beating Washington with a stool. While Smith was beating Washington, Campos heard gunshots in the bedrooms where Castro and Branch were located. Campos heard one of the women say, "You shot me." Her words were followed by another gunshot.

Shortly thereafter, Smith shot Washington, who was the last person to be shot. Campos saw Washington get shot once but heard two gunshots. The assailants then ransacked the residence and took multiple items, including electronic devices and cell phones belonging to the victims. Before leaving the residence, Smith returned to Campos's bedroom. Campos pretended to be

dead, and Smith left the room. Once the assailants were gone, Campos went to check on his housemates, who were all dead. After inspecting his wound in the bathroom, Campos sought help from a neighbor and called 911. Campos was admitted to the hospital and remained there for several days while receiving treatment for his gunshot wound.

## The Autopsies

The autopsies of Washington, Branch, and Castro revealed that each victim died from one or more gunshot wounds. Dr. Steven Nelson, the chief medical examiner for Polk, Highlands, and Hardee counties, testified that Washington sustained two gunshot wounds—one to the left side of his head, and one to the left side of his neck. Dr. Nelson recovered a nine-millimeter bullet from the gunshot wound to Washington's neck. Washington's body also showed abrasions, contusions, and lacerations that were consistent with having been beaten.

Branch sustained two nine-millimeter gunshot wounds—one to her right cheek, and one behind her left ear. She also sustained blunt force trauma. Dr. Nelson recovered a nine-millimeter bullet from Branch's head. According to Dr. Nelson, Branch would have

been able to talk, walk, and move after the gunshot wound to her right cheek. The gunshot behind Branch's left ear was the fatal wound.

Castro sustained a single distant nine-millimeter gunshot wound to the back of the head that caused significant brain damage. The gunshot wound was consistent with Castro having been on the ground with her face down.

### The Murder Investigation

The sole survivor, Campos, provided physical descriptions of the assailants but did not know them by their legal names. However, surveillance footage obtained from a store located at the corner of U.S. Highway 92 and Fairway Avenue in Lakeland identified a van of interest to the investigation, and Campos identified the van as the one in the driveway at the time of the murders. Additional footage from other local businesses and from red light cameras indicated that the van belonged to U-Haul Moving & Storage of Dade County, and the van was located in Miami two days after the murders.

The investigation revealed that the murders were drug-related and that there was a substantial connection between Washington

and Alcegaire's brother, Andrew Joseph. The victims' cell phones were found scattered within blocks of the crime scene, and information retrieved from Washington's phone indicated that Washington had been traveling back and forth between Lakeland and Miami. Washington's cell phone also contained numerous text messages between Washington and Joseph, photos of receipts for money sent to Joseph, and Joseph's address at the Monte Carlo apartments in Miami. Washington and Joseph communicated every day in the days leading up to the murders.

Campos testified that Washington was secretive about his travels to Miami. On cross-examination, Campos admitted to selling drugs for Washington while Washington and the others were away on January 5 and 6, and to giving Washington $500 upon their return to the residence around 4 a.m. on the morning of January 6.

Further investigation linked Joseph to the U-Haul van and, subsequently, to Alcegaire. Rental records, which were corroborated by cell phone and bank records, revealed that Joseph rented the van at 6:43 p.m. on January 5, the day before the

murders. Nine-millimeter ammunition was found in a latex glove inside of the van.

The lead detective showed Campos a photo lineup containing Joseph's photo. Campos was initially unable to identify Joseph from the lineup but later recognized him in a different photo and indicated that Joseph previously visited Washington's residence. Joseph was soon arrested while leaving his apartment.

During a search of Joseph's apartment, among other items, investigators found Alcegaire's personal belongings and latex gloves similar to the one found in the U-Haul van. Based on these developments, another photo lineup was prepared with Alcegaire's photo. On January 12, Campos immediately identified Alcegaire, stating: "This is the guy that was in the house when I was shot in the face and my friends were murdered."

Alcegaire was arrested on the same day that Campos identified him. At the time of his arrest, Alcegaire was getting a haircut to remove dreadlocks that he had been growing for approximately eighteen months. After Alcegaire's arrest, a straw hat was retrieved during a search of Joseph's car. Photos on Alcegaire's cell phone showed him wearing a straw hat just days before the murders.

Further evidence established Alcegaire's connections to Washington, Washington's residence in Lakeland, and the murders. Information retrieved from Washington's cell phone revealed a text message from Washington to Alcegaire dated December 27, 2015, containing Washington's 2314 East Magnolia Street address.

The same day, Alcegaire traveled to Lakeland. One of Washington's friends testified that he was at Washington's residence on December 27 when Alcegaire and two other men visited. During that time, Alcegaire displayed either a nine-millimeter or a .40 caliber firearm, and another individual filled a latex glove with ammunition. The witness observed that at that time, Alcegaire wore his hair in dreadlocks. Campos similarly testified that Alcegaire visited Washington's residence on that date and that Alcegaire wore his hair in dreadlocks. Alcegaire's visit was also corroborated by cell phone records. Alcegaire's cell phone utilized the cell phone tower across the street from Washington's residence, and Alcegaire and Washington had phone contact eighteen times that day.

On January 5, 2016, the day before the murders, Alcegaire's cell phone records placed him in the vicinity of the U-Haul rental

location at the time that Joseph rented the van, and in communication with Joseph around that time.

Surveillance footage from the Monte Carlo apartments captured the U-Haul van traveling into and out of the apartment complex on the evening of January 5 and the morning of January 6. On January 5, the U-Haul van entered the apartment gate at 9:41 p.m., and Alcegaire entered Joseph's apartment building minutes later.

Around 12:15 a.m. on January 6, Alcegaire drove the U-Haul van away from the complex, and he returned about one hour later accompanied by Smith. Alcegaire and Smith entered Joseph's apartment, and Joseph, who had left a few hours earlier, returned shortly thereafter.

At 1:45 a.m., Alcegaire and Smith left Joseph's apartment, and surveillance footage showed them on the apartment building elevator at 1:48 a.m. Alcegaire was wearing a straw hat and carrying zip ties, and Smith was wearing a ball cap. At 1:51 a.m., the U-Haul van exited the complex.

Toll plaza photos and cell phone tower records corroborated the movements of the U-Haul van, which traveled from Miami to

Lakeland on the Florida Turnpike. The U-Haul van was captured in multiple toll plaza photos, one of which showed the driver wearing a straw hat and the passenger wearing a ball cap. At 2:21 a.m., Alcegaire's cell phone utilized a cell phone tower near the Cypress Creek Toll Plaza. Toll plaza photos also showed the U-Haul van traveling southbound later that morning on its return to Miami.

At 10:40 a.m., Alcegaire and Smith returned to the Monte Carlo apartments in the U-Haul van. They entered Joseph's apartment, and at 11:32 a.m., they exited the apartment building carrying a white trash bag. Several minutes later, the U-Haul van drove out of the complex, followed by Joseph's car. Rental records indicated that the U-Haul van was returned to the rental location on January 6 at 12:27 p.m. The van's odometer indicated that the U-Haul van traveled 551 miles during the rental period. An investigator testified that the round trip from Miami to Lakeland is approximately 508 miles.

After the murders, Alcegaire attempted to delete his cell phone call logs covering the period from November 29, 2015, to January 7, 2016, but law enforcement was able to recover information from his phone. Alcegaire also deleted text messages from his phone that

were dated before January 7, 2016. The deleted messages included Washington's December 27 text message to Alcegaire that contained the East Magnolia address. Law enforcement also retrieved from Alcegaire's cell phone a history of the following web searches: "2314 East Magnolia"; "9 millimeter JHB"; "Is 114 a powerful grain for a 9 millimeter bullet?"; "Is there only one West Magnolia Street in Lakeland, Florida?"; and "Felix Campos, Felix Campos, 18-year-old Lakeland, Florida." Alcegaire also accessed numerous articles relating to the murders.

### Convictions, Penalty Phase, and Sentencing

At the conclusion of the presentation of evidence during the guilt phase, defense counsel moved for a judgment of acquittal. The trial court agreed that there was insufficient evidence that Alcegaire possessed a firearm and granted a judgment of acquittal only to that extent. Alcegaire was ultimately convicted of the following: three counts of first-degree murder (under the theories of both premeditated and felony murder) for the deaths of Washington, Branch, and Castro; the attempted first-degree murder of Campos; burglary of a dwelling with assault and/or battery (originally indicted for armed burglary of a dwelling with assault and/or

- 11 -

battery); conspiracy to commit armed robbery; conspiracy to commit first-degree murder; tampering with physical evidence; and robbery (originally indicted for armed robbery).

During the penalty phase, the State sought to prove the existence of the following aggravating factors as to each murder: (1) prior capital felony convictions for the contemporaneous murders of the other victims; (2) the murder was committed for pecuniary gain; (3) the murder was committed while engaged in the commission of robbery with a firearm; and (4) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification (CCP). To prove the aggravating factors, the State relied on evidence introduced during the guilt phase and on Alcegaire's convictions for first-degree murder and robbery.

The State also presented victim impact statements on behalf of each of the victims. Most of the statements were read by the prosecutor. The jury was instructed by the court and cautioned during closing arguments that the victim impact evidence was not to be considered as an aggravating factor.

Although Alcegaire insisted that the defense neither present mitigating evidence during the penalty phase nor offer a closing

argument, the jury was nonetheless instructed on the following mitigating circumstances: (1) the defendant was an accomplice in the first-degree murder committed by another person and his participation was relatively minor; (2) the defendant's age (twenty-five years old) at the time of the murder; and (3) the existence of any other factors in the defendant's character, background, or life or circumstances of the offense that would mitigate against the imposition of the death penalty. However, the jury did not find that these mitigating circumstances were established by the greater weight of the evidence. The jury unanimously found each aggravating factor as to each murder, and it unanimously recommended that Alcegaire be sentenced to death for the murders of Washington, Branch, and Castro.

Alcegaire also refused to allow mitigation to be presented on his behalf at his *Spencer* hearing.[1] However, in the defense's sentencing memorandum, counsel argued additional mitigating circumstances.

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

The trial court detailed its findings in its sentencing order, including the following findings as to the aggravating factors for each murder: (1) prior capital felony convictions for the contemporaneous murders of the other victims (great weight); (2) the murder was committed for pecuniary gain; (3) the murder was committed while engaged in the commission of robbery with a firearm (merged with pecuniary gain and assigned moderate weight); and (4) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification (CCP) (great weight).

The trial court made the following findings regarding mitigating circumstances: (1) the defendant was an accomplice in the first-degree murder committed by another person and his participation was relatively minor (not established; no weight); (2) the defendant's age (twenty-five years old) at the time of the murder (little weight); (3) the defendant acted under extreme distress or under the domination of another person (not established, no weight); (4) the jury did not hear any mitigation (not established, no weight); (5) the defendant is not the individual who caused the deaths (established, but no weight); (6) the defendant has

maintained an unwavering declaration of innocence (established, but no weight); (7) the defendant had good behavior while in the county jail awaiting trial (established, little weight); (8) the defendant demonstrated good courtroom behavior (established, moderate weight); (9) the non-applicability of the remaining aggravating factors (established, no weight); and (10) the victim, David Washington, was a drug dealer (established, little weight).

The trial court sentenced Alcegaire to death for each murder. Alcegaire was also sentenced as follows for the remaining crimes: life imprisonment for the attempted first-degree murder of Campos, burglary of a dwelling with assault and/or battery, and conspiracy to commit armed robbery; thirty years' imprisonment for conspiracy to commit first-degree murder; five years for tampering with physical evidence, and fifteen years for robbery.

This is Alcegaire's direct appeal.

## ANALYSIS

Alcegaire raises five issues in this appeal. Additionally, although he does not challenge it here, we consider the sufficiency of the evidence on which the State relied to obtain Alcegaire's convictions. We address each issue in turn.

## I. Motion for New Trial

Alcegaire challenges the trial court's summary denial of his motion for a new trial. The motion was based on summaries of post-trial statements made by Campos. Although the court denied the motion in an order dated March 14, 2019, the court questioned its jurisdiction to rule on the motion because Alcegaire's notice of appeal was filed three days earlier.

Indeed, because Alcegaire's notice of appeal had been filed, the trial court did not have jurisdiction to rule on the motion.

## II. Prosecutorial Argument

Alcegaire also argues that prosecutorial comments made during closing argument deprived him of a fair trial. Of the comments challenged by Alcegaire, defense counsel objected to only one, which occurred during the State's rebuttal argument.[2] Thus, this Court's review of the remaining comments—to which defense counsel did not object—is based on whether those comments constituted fundamental error. *See Brooks v. State*, 762 So. 2d

---

2. We consider this comment as a part of the closing argument cumulative error analysis in subsection (F) of this issue, and separately in issue III.

879, 898-99 (Fla. 2000) ("As a general rule, this Court has determined that failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that 'reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' ") (citations omitted) (quoting *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999)).

Alcegaire also argues that the totality of the prosecutor's comments resulted in cumulative error. To evaluate a closing argument for cumulative error, "we examine 'the entire closing argument with specific attention to the objected-to . . . and the unobjected-to arguments' in order to determine 'whether the cumulative effect' of any impropriety deprived [the appellant] of a fair trial." *Braddy v. State*, 111 So. 3d 810, 837 (Fla. 2012) (omission in original) (quoting *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001)). As we explain, Alcegaire is not entitled to relief.

## A. Facts Not in Evidence

Alcegaire argues that in support of the State's theory that Alcegaire acted as one of his brother's (Joseph's) soldiers in committing the murders, the prosecutor discussed facts not in evidence. Alcegaire challenges the prosecutor's closing argument characterization of a conversation between Smith and Washington before Washington was shot:

> Felix told you that he gave David a little over $500 when David came home that early morning. So David had money in his pocket. So they don't search through his pockets. I guess they're not smart enough to realize David has money in his pocket. But they find money in the home, and they are counting David's money.
> And David is saying, "I gave all the rest of it to Z or Zo. I gave all the rest of it to Z or Zo."
> But Jamaal Smith is saying "Where is it at? Where is the rest of it?"
> They're there on a mission. They're there on a mission to find what David has.

Although there was no testimony about the exact words exchanged between Washington and Smith, the prosecutor's argument was a fair comment on the evidence. Campos, a witness to the altercation between Smith and Washington, testified that Smith counted Washington's money and beat him with a stool. The autopsy confirmed that Washington suffered injuries consistent

with being beaten. Campos also testified that he remained in Lakeland and sold drugs for Washington while Washington, Branch, and Castro briefly traveled to Miami, and that he gave Washington $500 upon the group's return home. There is no error in the prosecutor's argument.

Alcegaire also contends that the prosecutor argued facts not in evidence by misrepresenting the relationship between Washington and Branch. For instance, Alcegaire argues that the prosecutor wrongly referred to Branch as "the love of [Washington's] life." However, Washington and Branch were dating and lived together. Washington referred to Branch as his wife. There is no error in this characterization, which was made in response to the defense's suggestion that only one person, Smith, committed the murders. The prosecutor's argument was that if Smith was the only assailant, Washington would have been in a better position to overpower Smith and save Branch; Washington would not have simply waited in the living room while Smith walked away to kill her. The prosecutor drew a reasonable inference from the evidence.

## B. Impermissible Bolstering

Alcegaire also asserts that the prosecutor improperly bolstered Campos's testimony by (1) explaining Campos's demeanor on the witness stand; (2) telling the jury that Campos feared for his life; (3) arguing that Campos worked hard to avoid identifying the wrong people when shown photo lineups of possible suspects; and (4) suggesting that Campos was in shock after the shootings. We address each claim and conclude that each is without merit.

### 1. Campos's demeanor

Alcegaire argues that the prosecutor improperly bolstered Campos's testimony by suggesting that the way Campos presented on the stand was the result of his injury and the failure to get proper treatment. The prosecutor argued:

> I know—I anticipate that the Defense is going to get up here and ask you not to believe Felix. Felix is a huge part of this case. I'm going to ask you to think about Felix and how he was in that witness stand. Felix sat sideways. He wouldn't look at anyone. He stared down, wouldn't make eye contact.
>
> When the doctor testified, I asked him about some of the side effects that someone would suffer from an injury, and he had indicated some of the things that someone would suffer from going through what Felix has gone through, especially someone who had not gotten any counseling or treatment. I ask you to remember that.

The trauma physician who treated Campos testified as follows with respect to the lasting effects of Campos's injuries:

> Physically, a lot of jaw injuries, which means he would have problems swallowing, problems eating, problems with the chewing mostly. He would have some nerve injury over that side, which means he wouldn't be able to smile correctly or appropriately. He would have problems with just fluid collection in that area, because the sweat glands and the salivary glands would have been injured also.

When asked what would happen if someone in Campos's position did not receive treatment, the doctor indicated that the effects of his injuries would worsen over time. The prosecutor's argument was framed in a manner consistent with the question posed to the treating physician. There is no error in this argument.

### 2. Campos's fear

Alcegaire also argues that the prosecutor improperly bolstered Campos's testimony by stating that Campos feared for his life. The prosecutor's statement that Campos feared for his life slightly differed from Campos's trial testimony, which was as follows:

> **Prosecutor:** Now Felix, is the reason that you don't want to be here because you don't want to be involved in this trial?
> **Campos:** Yes.
> **Prosecutor:** Is it because you're afraid?
> **Campos:** Yes.

- 21 -

The jury knew that Campos was the sole surviving witness after being shot in the face and left for dead in a residence where his three housemates were murdered. Campos indicated that he did not want to testify and was afraid. There is no error in the prosecutor's statement, which drew a fair inference from the evidence.

### 3. Campos's attempts to identify suspects

Alcegaire challenges the prosecutor's comments that Campos "worked hard not to pick the wrong people" and that he "does not want the wrong people convicted." There is no error in these comments. Law enforcement officers testified about the multiple visits with Campos in the days following the incident and the fact that Campos did not immediately identify the suspects. The prosecutor offered fair comments on the evidence.

### 4. Campos in shock after the shooting

Alcegaire also argues that the prosecutor improperly bolstered Campos's testimony by stating that Campos was in shock after being shot. While Alcegaire is correct that there was no medical testimony that Campos was in shock, the prosecutor was entitled to draw a reasonable inference from the evidence. This evidence

established that Campos was at home when his three housemates were murdered, and indeed, he was the sole survivor after being shot in the face and left for dead. The prosecutor's comment was not improper.

## C. Denigrating the Defense and the Defendant

Alcegaire also maintains that the prosecutor denigrated him as well as defense counsel by (1) suggesting that the defense argument "doesn't fit the bill" and doesn't match the evidence presented; (2) claiming that an argument was absurd; (3) responding to the defense counsel's attack on the State's circumstantial evidence; and (4) offering improper commentary about Alcegaire's behavior while riding in an elevator with Smith hours before the murders. The prosecutor's comments in the first three points fall within the scope of reasonable argument, and Alcegaire has failed to establish any error, let alone fundamental error. We address the fourth point, regarding Alcegaire's and Smith's behavior in the elevator, because of Alcegaire's argument that the comments were inflammatory. However, we conclude that no error occurred.

Among the surveillance footage from the Monte Carlo apartment complex was a video recording without sound that

captured Alcegaire and Smith in an elevator as the two prepared to leave the complex and travel to Lakeland. During closing, referring to the video, the prosecutor argued: "He [Alcegaire] was in that elevator, high-fiving Jamaal Smith, whoop, whoop, excited to come to Lakeland to kill these people. They were happy and ready to go to come down here and take the lives of these four young people who had such futures ahead of them."

We disagree with Alcegaire's argument that the prosecutor misrepresented the behavior in the elevator. The video clearly demonstrates that Alcegaire and Smith, who were talking and smiling, appeared to be excited and in a good mood. Although they did not "high-five" one another in the traditional sense, Alcegaire and Smith slapped their palms together multiple times, did a hand gesture, and shook hands.

During the brief period of time in the elevator, Alcegaire and Smith were in the very process of leaving the apartment building to drive to Lakeland where they committed multiple murders. Their lighthearted behavior on the elevator reflected none of the gravity of the crimes that occurred mere hours later. There was no error in the prosecutor's argument.

## D. Expressions of Personal Belief and Opinion

Alcegaire also argues that the prosecutor improperly offered personal beliefs and opinions throughout the closing argument by using the words "I think." In particular, Alcegaire challenges the prosecutor's description of him as one of his brother's soldiers as unsupported by the evidence. For instance: "I think Johnathan Alcegaire was there because, again, I believe him to be a soldier for his brother. I think that he had a job to do, and he came to Lakeland to do it."

Far from being an expression of improper belief or opinion, the evidence presented at trial established that Washington and Joseph engaged in drug-related transactions. On the evening of January 5, 2016, Alcegaire coordinated with Joseph regarding the rental of the U-Haul van. Alcegaire drove the van throughout the evening (as captured by surveillance footage at the Monte Carlo apartments), and he drove the van from Miami to Lakeland and back on the morning of January 6. Campos identified Alcegaire as one of the assailants that morning; Campos also testified that in an attempt to extract money, Washington was beaten before being shot.

Alcegaire's argument is without merit, as the State's argument was a fair comment on the evidence.

Alcegaire also asserts that the prosecutor improperly opined that Campos was in shock after the murders. As we explained in subsection B of this issue, the evidence supported the prosecutor's comment.

### E. Justice for the Victims

Alcegaire argues that the prosecutor improperly argued for justice for the victims. The prosecutor said:

> Felix Campos is the reason that we are able to be in this courtroom today and the reason that we are able to seek justice for David Washington and Stacy Branch and Angelica Castro and for our unwilling victim, Felix Campos.
>
> . . . .
>
> He's guilty of all nine counts in that indictment. These victims deserve justice. That's why you're here. I'm asking you to return verdicts of guilty. Thank you so much.
>
> . . . .
>
> . . . The biggest mistake they made was letting Felix Campos live. And again, justice needs to be served.

This Court has emphasized the impropriety of using an argument that seeks justice for a victim:

> When the State instead uses closing argument to appeal to the jury's sense of outrage at what happened to the

victim and asks the jurors to return a verdict that brings "justice" to the victim, the State perverts the purpose of closing argument and engages in the very type of argument that has been repeatedly condemned as antithetical to the foundation of our criminal justice system that guarantees a fair trial to every accused.

*Cardona v. State*, 185 So. 3d 514, 520 (Fla. 2016). In *Cardona*, a case involving the murder of a three-year-old child and a horrific pattern of abuse that preceded the child's death, the prosecutor repeatedly stated the words "justice for Lazaro," and in fact, used the phrase "as the theme of the closing argument." *Id.* at 521-22. Concluding that the prosecutor's comments "pervaded the prosecutor's closing argument," we concluded that Cardona was entitled to a new trial. *Id.* at 523. Having reviewed the argument in its entirety, we conclude that the prosecutor's comments did not become the theme of, nor pervade the closing argument. Consequently, Alcegaire is not entitled to relief.

### F. Cumulative Error in Closing Argument

Alcegaire argues cumulative error with respect to the prosecutor's closing argument. Alcegaire's argument includes a portion of the State's rebuttal argument that involved the use of a demonstrative aid. While we discuss the rebuttal argument claim

in issue three, we have considered it here in the context of the State's entire closing argument.

"We do not review each of the allegedly improper comments in isolation; instead, we examine 'the entire closing argument with specific attention to the objected-to . . . and the unobjected-to arguments' in order to determine 'whether the cumulative effect' " of those arguments deprived Alcegaire of a fair trial. *Braddy v. State*, 111 So. 3d 810, 837 (Fla. 2012) (quoting *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001)). Having carefully reviewed the entirety of the State's closing argument, we conclude that Alcegaire's cumulative error claim is without merit.

## III. Rebuttal Argument and the Use of a Demonstrative Aid

Evidence introduced at trial revealed that on December 27, 2015, Alcegaire received a text message from Washington containing Washington's home address, 2314 East Magnolia Street in Lakeland. Alcegaire used his cell phone to conduct an internet search for that address, and he traveled there from Miami the same day. Several days later, on January 3, 2016, Alcegaire used his cell phone to search for another address in Lakeland, 2031 West Magnolia Street. During witness testimony and closing argument,

defense counsel relied on the evidence of Alcegaire's search for the West Magnolia address to suggest that when the murders occurred, Alcegaire was at that location, not at Washington's residence.

During closing rebuttal argument, the prosecutor showed the jury a map depicting both the East Magnolia and West Magnolia addresses and argued that it was unlikely that upon arriving in Lakeland, Alcegaire went to the West Magnolia address, remained there while the murders were occurring, and was picked up afterward.[3] Defense counsel objected to the use of the map and the corresponding argument on the ground that the prosecutor was "admitting new evidence that was not before the jury in closing arguments." The trial court overruled the objection. The map was received as a court exhibit and was not admitted into evidence.

The trial court did not err in permitting the use of the map as a demonstrative aid. We review trial court rulings on the use of demonstrative aids for an abuse of discretion. *Davis v. State*, 121

---

3. The map showed that East Magnolia Street and West Magnolia Street are two separate streets, not different ends of the same street. Witness testimony established that West Magnolia Street was west of East Magnolia Street.

So. 3d 462, 488 (Fla. 2013) (quoting *Williams v. State*, 967 So. 2d 735, 752 (Fla. 2007)).  Although the map depicting the two addresses was first shown during rebuttal, the jury heard testimony regarding Washington's East Magnolia address, and it learned that before the murders, Alcegaire conducted internet searches for the East Magnolia and the West Magnolia addresses.  Thus, the evidence visually demonstrated on the map was not without support in the record.

Moreover, having reviewed the relevant portions of the record, we reject Alcegaire's argument that the prosecutor deliberately offered false or misleading argument in rebuttal.  In responding to the defense's assertion that Alcegaire was at 2031 West Magnolia Street and not at Washington's residence when the murders occurred, the prosecutor argued that it was unlikely that the U-Haul van traveled a route that placed Alcegaire in proximity to 2031 West Magnolia Street.  However, red light camera footage demonstrated that after the murders, the van traveled on U.S. Highway 92, in the vicinity of the West Magnolia Street address.

While evidence placed the van in the general area of the West Magnolia Street address, as conceded by defense counsel during

closing argument, there was a question as to the exact streets the van traveled throughout the Lakeland area. The surveillance footage captured brief periods of time and did not offer a continuous account of the van's movements to and from the crime scene. The trial court did not abuse its discretion in this instance.

## IV. Victim Impact Evidence

Alcegaire challenges the victim impact evidence offered by the State, which consisted of statements from a total of ten witnesses. Most of the statements were read by the prosecutor. "Evidence of a family member's grief and suffering due to the loss of the victim is evidence of 'the resultant loss to the community's members by the victim's death' permitted by section 921.141(7), and the admission of such evidence is consistent with the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)." *Victorino v. State*, 127 So. 3d 478, 496 (Fla. 2013).[4] Two statements were offered on behalf of Washington, four statements were offered on behalf of Branch, and four statements

---

4. The Florida statute governing victim impact evidence is now codified in section 921.141(8), Florida Statutes (2020).

were offered on behalf of Castro. Before the State began its victim impact presentation, defense counsel affirmatively stated that there was no objection. Alcegaire's challenge is without merit.

Alcegaire's decision to waive the presentation of mitigation during the penalty phase did not alter the State's right to present victim impact testimony, and the presentation of such testimony did not render the penalty phase fundamentally unfair. The trial court instructed the jury that the victim impact testimony was not to be used for finding aggravation and was not to be considered as an aggravating factor.

Moreover, the victim impact statements were relatively short and were within the scope of proper victim impact evidence, describing each victim's uniqueness as an individual and the resultant loss to the community. Additionally, the victim impact testimony was limited to two to four witnesses per victim. In *Deparvine v. State*, 995 So. 2d 351, 378 (Fla. 2008), the testimony of five victim impact witnesses (three representing one victim and two representing the other victim) was admissible. *See also Farina v. State*, 801 So. 2d 44, 52 (Fla. 2001) (no error in the admission of victim impact testimony of twelve witnesses for one victim where the

testimony stayed within the requirements of *Payne v. Tennessee*). There was no error in the State's presentation of victim impact evidence.

## V. Cumulative Error

Alcegaire claims that the cumulative effect of the various alleged errors deprived him of a fair trial. "However, where the alleged errors urged for consideration in a cumulative error analysis are individually either procedurally barred or without merit, the claim of cumulative error also necessarily fails." *Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020) (quoting *Israel v. State*, 985 So. 2d 510, 520 (Fla. 2008)).

## VI. Sufficiency of the Evidence

Alcegaire does not challenge the sufficiency of the evidence on which the State relied to obtain its convictions. Nonetheless, this Court must independently evaluate each death case for the sufficiency of the evidence relied upon to convict the defendant. *See Caylor v. State*, 78 So. 3d 482, 500 (Fla. 2011). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable

doubt." *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006) (citing *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)). "[T]he concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment." *Tibbs v. State*, 397 So. 2d 1120, 1123 (1981).

Alcegaire's convictions are supported by competent, substantial evidence. Alcegaire was a key participant in the crimes for which he was convicted. After Joseph rented the U-Haul van on January 5 expressly for the purpose of round-trip travel from Miami to Washington's residence in Lakeland, Alcegaire drove the van that evening and drove it to and from Lakeland on January 6. Surveillance footage—before and after the murders—showed Alcegaire driving the van. Alcegaire was also captured on surveillance footage with Smith, both in the van and at the Monte Carlo apartment complex.

The testimony of Campos, the lone surviving witness, placed Alcegaire at the crime scene during the murders. Campos recognized Alcegaire from a recent visit to Washington's residence,

and that visit was corroborated by other witness testimony and by data retrieved from cell phone records.

Alcegaire was seen on surveillance footage wearing a straw hat at the Monte Carlo apartments on the morning of the murders. The State also introduced recent cell phone photos of Alcegaire wearing a straw hat. The driver of the U-Haul van wore a straw hat, and a straw hat was later found in the trunk of Joseph's car.

After the murders, Alcegaire used his cell phone to conduct multiple internet searches related to the murders. He deleted text messages, including a text message from Washington containing Washington's address. He also deleted his phone call history from his cell phone. At the time of Alcegaire's arrest, he was changing his appearance by having his distinctive dreadlocks removed. Competent, substantial evidence supports Alcegaire's convictions.

## CONCLUSION

For these reasons, we affirm Alcegaire's convictions and sentences.

It is so ordered.

POLSTON, LABARGA, MUÑIZ, and GROSSHANS, JJ., concur.
CANADY, C.J., concurs in result with an opinion, in which
LAWSON and COURIEL, JJ., concur.
COURIEL, J., concurs in part and concurs in result with an
opinion, in which LAWSON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION
AND, IF FILED, DETERMINED.

CANADY, C.J., concurring in result.

I concur with the decision to affirm Alcegaire's convictions and

sentences. On issue III, I would conclude that any errors in the

prosecutor's use of the map as a demonstrative aid and in the

argument based on the map were harmless beyond a reasonable

doubt. The use of the map and the related arguments followed in

response to the defense argument that the defendant was never at

the crime scene but had instead been dropped off before and picked

up after the murders at another location. This argument by the

defense is without any factual support in the record; it constitutes

nothing more than pure speculation. And it is refuted by the

eyewitness testimony of the surviving victim, which unequivocally

placed the defendant at the crime scene when the murders were

committed. Given these circumstances and the whole evidentiary

- 36 -

context, it is clear beyond a reasonable doubt that any errors in the use of the map and in the related argument were harmless.

LAWSON and COURIEL, JJ., concur.

COURIEL, J., concurring as to parts II-VI and concurring in result.

Even if he could not establish that he had been prejudiced, Alcegaire would be entitled to a new trial if the jurors had decided his verdict by lot, if the verdict was contrary to law or the weight of the evidence, or—and this is the provision at issue here—

> [n]ew and material evidence, which, if introduced at the trial would probably have changed the verdict or finding of the court, and which the defendant could not with reasonable diligence have discovered and produced at the trial, ha[d] been discovered.

Fla. R. Crim. P. 3.600(a)(3); *see also Jones v. State*, 591 So. 2d 911 (Fla. 1991). The trial court decided Alcegaire was not entitled to a new trial on that basis, and we review that decision for abuse of discretion. *See Consalvo v. State*, 937 So. 2d 555, 562 (Fla. 2006); *Bell v. State*, 90 So. 2d 704, 705 (Fla. 1956).

I find none. While Felix Campos's testimony at trial (that he saw Alcegaire inside the residence on the morning of the crime) differs from his post-trial statement (that he heard his voice there and then, but did not see him), that testimony still puts Alcegaire at

the scene of the murder. In that respect, this testimony corroborates other evidence in the record, including security camera footage showing Alcegaire driving into and out of the apartment complex. On these facts, the trial court's decision to deny Alcegaire's motion for a new trial was not arbitrary, fanciful, or unreasonable; we cannot say that no reasonable person would have denied it. *See Frances v. State*, 970 So. 2d 806, 813 (Fla. 2007).

Alcegaire argues that "[t]he trial court should have granted [his] Motion for New Trial." It is the State, not Alcegaire, contending before us that the trial court lacked jurisdiction to rule on the motion. And there is some support for the State's position, which today's majority adopts. *See* Philip J. Padovano, *Florida Appellate Practice* § 1:6 (2021 ed.), "Jurisdiction pending review" ("Subject to . . . exceptions [not applicable here], the trial court may not address the merits of an order or judgment in a criminal case after the filing of a notice of appeal. For example, the trial court lacks jurisdiction to grant a judgment of acquittal or a new trial after the defendant has filed a notice of appeal from the conviction.").

But we need not decide that question today to affirm the trial court's decision. Whether for want of jurisdiction or on the basis of

the evidence introduced at trial, it was no abuse of discretion to

deny the motion for a new trial.

LAWSON, J., concurs.

An Appeal from the Circuit Court in and for Polk County,
    Jalal A. Harb, Judge
      Case No. 532016CF000284A000XX

Howard L. "Rex" Dimmig, II, Public Defender, Bartow, Florida, and
Alice B. Copek, Special Assistant Public Defender, Tenth Judicial
Circuit, Tallahassee, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Timothy
A. Freeland, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee